JCS/BEF: USAO 2007R00360

FILED
LODGED

APR 22 2009

AT GR...
CLERK U.S. ...
DISTRICT ...
BY_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | RWT 09 CR 0213 |
| v. | * | CRIMINAL NO. |
| | * | |
| ANDREW HAMILTON WILLIAMS, JR. | * | (Conspiracy, 18 U.S.C. § 1349; Wire |
| MICHAEL ANTHONY HICKSON, | * | Fraud, 18 U.S.C. § 1343; Conspiracy to |
| ISAAC JEROME SMITH, | * | Commit Money Laundering, 18 U.S.C. |
| ALVITA KAREN GUNN, | * | § 1956(h); Aiding and Abetting, |
| | * | 18 U.S.C. § 2; False Declarations, 18 |
| Defendants | * | U.S.C. § 1623; Bank Fraud, 18 U.S.C. |
| | * | § 1344;  Forfeiture, 28 U.S.C. § 2461, 18 |
| | * | U.S.C. § 981, 21 U.S.C. § 853) |
| | * | |
| | * | |

*******

## INDICTMENT

## COUNT ONE

The Grand Jury for the District of Maryland charges that:

## Introduction

At all times relevant to this Indictment:

1.      Beginning in or about 2005, and continuing through in or about October 2007, in

the District of Maryland and elsewhere, defendants **ANDREW HAMILTON WILLIAMS, JR,**

**MICHAEL ANTHONY HICKSON, ISAAC JEROME SMITH,** and **ALVITA KAREN**

**GUNN** conspired with each other and others known and unknown to the Grand Jury, using the

corporate names "Metropolitan Grapevine LLC," "Metro Dream Homes," "POS Dream Homes,"

and "POS DH LLC" (hereinafter "MDH" or "the Company"), to target homeowners and home

purchasers to participate in a purported investment opportunity called the "Dream Homes

Program."  To participate in the Dream Homes Program, an investor had to provide a minimum

of $50,000 for each home enrolled in the Dream Homes Program, in addition to an "administrative fee" of up to $5,000. In exchange, MDH promised to make the homeowner's future monthly mortgage payments, and pay off the homeowner's mortgage within five to seven years. At the end of the five to seven years, the homeowner and MDH would own an equal interest in the home.

2.      The Defendants and other MDH representatives explained that the initial investment of at least $50,000 would fund three revenue-generating ventures. The first purported venture involved placing automated teller machines ("ATMs") in high-traffic areas within the community. MDH represented that each ATM would generate approximately $3,000 per month in revenue from user fees for MDH. The second purported venture involved placing "Touch-N-Buy" electronic kiosks in various locations to sell telephone calling cards and other items. MDH represented that each kiosk would generate approximately $7,500 per month in commission revenue for MDH. On occasion, MDH referred to these kiosks as "POS Cafes." The third purported venture involved placing flat screen televisions (or "billboards") showing video advertisements in various businesses. MDH represented that each billboard would generate approximately $10,000 per month in revenue for MDH.

3.      The Defendants and other MDH representatives claimed this business model already was successfully generating significant amounts of revenue that was being used to pay the mortgages of existing Dream Homes Program investors.

4.      As a part and result of the conspiracy, (a) at no time did any of the ventures promoted by the Defendants generate any material revenue for MDH; (b) the Defendants used the funds from later investors in the Dream Homes Program to make certain mortgage payments for

earlier investors; (c) the Defendants used the investor funds to enrich themselves; and (d) when the Defendants stopped making mortgage payments, the homeowners were left to fend for themselves and attempt to make the mortgage payments MDH had promised to make in full.

5.     As a result of the conspiracy, over 1,000 investors in the Dream Homes Program invested approximately $70 million, and MDH failed to live up to its promises of paying off investor mortgages.

## Parties, Persons and Entities

6.     Defendant **ANDREW HAMILTON WILLIAMS, JR. ("WILLIAMS")** was the founder and owner of MDH.  In or about February 2001, the Securities Commissioner of the State of Maryland obtained a permanent injunction against **WILLIAMS** and others due to **WILLIAMS**'s involvement in offering an unregistered ATM investment program called the "Bankcard Group."

7.     Defendant **MICHAEL ANTHONY HICKSON ("HICKSON")** was the chief financial officer of MDH.

8.     Defendant **ISAAC JEROME SMITH ("SMITH")** was the President of MDH.

9.     Defendant **ALVITA KAREN GUNN ("GUNN")** was the Vice President of Operations of MDH.

10.     **Carole Nelson** was the chief financial officer of POS Dream Homes.

11.     MDH was a District of Columbia limited liability company with its main office in Laurel, Maryland.

## The Conspiracy

12.     Beginning in or about 2005, and continuing through in or about October 2007, in

the District of Maryland and elsewhere, the defendants,

**ANDREW HAMILTON WILLIAMS, JR.,**
**MICHAEL ANTHONY HICKSON,**
**ISAAC JEROME SMITH, and**
**ALVITA KAREN GUNN,**

did knowingly and willfully conspire, combine, confederate and agree with each other and other

persons known and unknown to the Grand Jury to knowingly devise a scheme and artifice to defraud

the homeowners, and to obtain money and property from the homeowners, by means of materially

false and fraudulent pretenses, representations, and promises ("the scheme to defraud") and for the

purpose of executing and attempting to execute the scheme to defraud would and did transmit and

cause to be transmitted by means of wire and radio communication in interstate and foreign

commerce, writings, signs, signals, pictures and sounds, in violation of 18 U.S.C. § 1343.

## Manner and Means of the Conspiracy and Scheme to Defraud

13.     It was a part of the conspiracy and scheme to defraud that, in order to give the Dream

Homes Program the veneer of legitimacy and financial success, the Defendants and other MDH

representatives marketed the Dream Homes Program through live presentations at luxury hotels in

Maryland, Washington, DC, and Beverly Hills, California, among other locations.

14.     It was further a part of the conspiracy and scheme to defraud that when

prospective investors attended MDH presentations, the Defendants and other MDH

representatives explained that, in exchange for a minimum $50,000 investment, MDH would

4

immediately start making monthly mortgage payments on behalf of each investor, and the

homeowner's mortgage would be paid off within five to seven years. MDH represented that, at

the end of the five to seven years, the homeowner and MDH would own an equal interest in the

home.

15.     It was further a part of the conspiracy and scheme to defraud that the Defendants and

other MDH representatives arranged for early Dream Homes Program investors, whose monthly

mortgage payments had been paid by MDH using the funds of later Dream Homes Program

investors, to attend recruitment meetings to assure potential investors that the Dream Homes

Program was not a fraud. MDH used a third party company, C.I.P., to direct certain payments to

Dream Homes Program investors for the purpose of encouraging them to advertise the Dream Homes

Program to friends and family, as well as to persuade Dream Homes Program investors that the use

of C.I.P. would result in a portion of their funds being donated to charity.

16.     It was further a part of the conspiracy and scheme to defraud that MDH encouraged

homeowners to refinance existing mortgages on their homes in order to withdraw equity and

generate the funds necessary to enroll their homes in the Dream Homes Program.

17.     It was further a part of the conspiracy and scheme to defraud that the Dream

Homes Program was also marketed to prospective homeowners. The Defendants and other

MDH representatives told prospective homeowners they could enroll their newly purchased

homes into the Dream Homes Program by incorporating the $50,000 (or greater) investment fee

into the mortgages they would obtain to finance their home purchases. The Defendants and other

MDH representatives arranged for mortgage lenders and real estate agents to attend many Dream

Homes Program investor meetings for the purpose of facilitating such transactions. The

5

Defendants and other MDH representatives told some Dream Homes Program investors who had purchased homes they should not worry about the price of the homes or the monthly mortgage payments because MDH would make the payments on their behalf.

18.     It was further a part of the conspiracy and scheme to defraud that the Defendants and other MDH representatives encouraged investors to enroll more than one home into the Dream Homes Program.  MDH required homeowners to pay a minimum $50,000 investment fee for each home they enrolled into the Dream Homes Program.

19.     It was further a part of the conspiracy and scheme to defraud that in order to persuade homeowners to enroll promptly in the Dream Homes Program and invest more than the minimum $50,000 investment fee, MDH representatives offered certain incentives.  Under these incentives, prospective investors were told that those who invested $100,000 or more would be granted a seat on the MDH "Junior Board of Directors" ("Junior Board").  In addition to having his or her mortgage paid, a Junior Board member was entitled to an additional $52,000 per year in payments (to be distributed in monthly installments of $4,333.33) in exchange for attending two or three meetings of MDH investors per month.  Prospective investors were told those who invested $150,000 or more would be granted a seat on the MDH "Senior Board of Directors" ("Senior Board").  In addition to the compensation given to Junior Board members, Senior Board members were entitled to additional compensation as a result of their status.

20.     It was further a part of the conspiracy and scheme to defraud that the Defendants made and caused to be made numerous misrepresentations and omissions of facts in their presentations soliciting individuals to invest in the Dream Homes Program, including the following:

6

a.      Early Dream Homes Program investors were never told their investments were being used, in part, to pay off investors in the Bankcard Group, a prior failed investment venture that **WILLIAMS** had founded.

b.      The Defendants and other MDH representatives explained MDH was earning substantial profits from the strategic placement of ATMs, flat screen televisions, and "Touch-n-Buy" kiosks.  In fact, these items were not generating any meaningful revenue for MDH.

c.      The Defendants and other MDH representatives said the revenue from the ATMs, flat screen televisions, and "Touch-n-Buy" kiosks was more than sufficient to pay each investor's monthly mortgage payment, and to pay investor mortgages in full within five to seven years.  In fact, MDH was making the mortgage payments of early Dream Homes Program investors using funds obtained from later Dream Homes Program investors.

d.      The Defendants and other MDH representatives said Metro Dream Homes had placed many revenue-generating ATMs within various communities, and these ATMs were generating revenue.  In fact, Metro Dream Homes had installed only a few ATMs, which did not generate any meaningful revenue.

e.      The Defendants and other MDH representatives said the flat screen televisions ("billboards") were generating more than sufficient revenue to pay off investor mortgages.  In fact, although there were many billboards installed at the sole expense of MDH, these billboards did not generate any meaningful revenue for MDH.  The vast majority of advertisements shown on the billboards were for MDH and its related entities and generated no revenue for MDH.

7

f.      The Defendants and other MDH representatives failed to disclose that
MDH used investor funds to pay select MDH employees (including the Defendants) salaries of
up to $200,000 per year.

g.      The Defendants and other MDH representatives failed to disclose that
rampant theft was taking place at MDH because the internal inventory controls of the flat screen
televisions supporting the billboards program were very poor.

h.      The Defendants and other MDH representatives failed to disclose that they
used Dream Homes Program investor funds to employ a staff of approximately ten chauffeurs.

i.      The Defendants and other MDH representatives failed to disclose that
MDH used Dream Homes Program investor funds to purchase and maintain a fleet of luxury cars
for the personal and business use of select MDH employees, including several Mercedes-Benz
automobiles and Cadillac, Chevrolet, Lincoln and Land Rover sport utility vehicles.

j.      The Defendants and other MDH representatives failed to disclose that
MDH used Dream Homes Program investor funds to pay for select MDH employees to travel to
and attend the 2007 National Basketball Association All-Star game, and stay in luxury
accommodations.

k.      The Defendants and other MDH representatives failed to disclose that
MDH used $60,000 in Dream Homes Program investor funds to pay for tickets to the 2007
National Football League Super Bowl, and MDH used additional investor funds to pay for luxury
accommodations for select MDH employees.

l.      The Defendants and other MDH representatives failed to disclose that
MDH used investor funds to make monthly mortgage payments on behalf of select MDH

employees, despite the fact that those employees had not made any financial investment into the Dream Homes Program.

        m.     The Defendants and other MDH representatives failed to disclose that MDH used Dream Homes Program investor funds to make multiple donations of up to $50,000 each to charitable organizations, to give the company the appearance of being financially successful.

        n.     The Defendants and other MDH representatives failed to disclose that MDH transferred millions of dollars in investor funds to third party businesses for purposes not disclosed to Dream Homes Program investors.

        o.     The Defendants and other MDH representatives failed to disclose that MDH had not filed any federal income tax returns throughout its existence.

    21.     It was further a part of the conspiracy and scheme to defraud that after August 15, 2007 – when the Securities Commissioner of the State of Maryland issued a cease and desist order to **WILLIAMS**, MDH, and other related entities, directing them to immediately cease the offering and sale of unregistered securities in connection with their promotion of the Dream Homes Program – the Defendants called additional meetings of Dream Homes Program and during those meetings made and caused to be made numerous misrepresentations and omissions of facts, including the following:

        a.     The Defendants and other MDH representatives said MDH was financially successful, earning up to $10 million in one month.  In fact, the sole source of meaningful revenue for Metro Dream Homes was new investor funds.

b.      The Defendants and other MDH representatives said there were multiple companies that were in negotiations to purchase all of the mortgage obligations held by Metro Dream Homes, and such companies could pay off the mortgages of Dream Homes Program investors.  In fact, no company was offering to pay off the Dream Homes Program investor mortgages.

c.      The Defendants and other MDH representatives said individuals who wanted a refund of their investment fees would be able to obtain refunds by filing certain paperwork.  In fact, after such investors filed the necessary paperwork, MDH failed to respond to their refund requests.

d.      The Defendants and other MDH representatives said MDH was in negotiations with a major bank to secure a loan with which to keep MDH operational.  The Defendants and other MDH representatives failed to disclose that such a loan was necessary because none of MDH's alleged investment ventures were generating revenue.

22.     It was further a part of the conspiracy and scheme to defraud that, on or about September 4, 2007, the Defendants filed a legal challenge to the cease and desist order in the United States District Court for the District of Maryland.  At a hearing on or about September 12, 2007, **HICKSON** testified that the financial success of the Dream Homes Program did not rely upon new investor funds, when in fact **HICKSON** knew that the sole source of meaningful revenue for MDH was new investor funds.

18 U.S.C. § 1349

10

## COUNTS TWO THROUGH SIXTEEN

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 11 and 13 through 22 of Count One are incorporated here and constitute a scheme and artifice to defraud as described in paragraph 12 of Count One ("the scheme to defraud").

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the defendants,

**ANDREW HAMILTON WILLIAMS, JR.,**
**MICHAEL ANTHONY HICKSON,**
**ISAAC JEROME SMITH, and**
**ALVITA KAREN GUNN,**

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly cause to be transmitted in interstate commerce by means of wire communications certain signals, signs, and sounds, the following:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 2 | February 28, 2007 | A wire transfer in the amount of $264,333.13 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 3 | March 12, 2007 | A wire transfer in the amount of $50,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 4 | March 12, 2007 | A wire transfer in the amount of $28,499.99 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 5 | March 23, 2007 | A wire transfer in the amount of $20,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |

| 6 | April 16, 2007 | A wire transfer in the amount of $450,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
|---|---|---|
| 7 | April 24, 2007 | A wire transfer in the amount of $40,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 8 | May 2, 2007 | A wire transfer in the amount of $500,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 9 | May 30, 2007 | A wire transfer in the amount of $30,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 10 | June 1, 2007 | A wire transfer in the amount of $400,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 11 | June 8, 2007 | A wire transfer in the amount of $200,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 12 | June 11, 2007 | A wire transfer in the amount of $20,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 13 | July 6, 2007 | A wire transfer in the amount of $300,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 14 | July 13, 2007 | A wire transfer in the amount of $50,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 15 | July 18, 2007 | A wire transfer in the amount of $400,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |
| 16 | July 20, 2007 | A wire transfer in the amount of $175,000 from MDH's account at Bank of America in Maryland to a bank account of C.I.P. at Palm Desert National Bank in California. |

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT SEVENTEEN

The Grand Jury for the District of Maryland further charges that:

1.       Paragraphs 1 through 11 and 13 through 22 of Count One are incorporated here .

2.       Beginning no later than in or about 2005, and continuing through in or about October 2007, in the District of Maryland and elsewhere, the defendants,

**ANDREW HAMILTON WILLIAMS, JR.,**
**MICHAEL ANTHONY HICKSON,**
**ISAAC JEROME SMITH, and**
**ALVITA KAREN GUNN,**

unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with others known and unknown to the United States, to commit a violation of Title 18, United States Code, Section 1956, to wit, knowingly to conduct and attempt to conduct a financial transaction which involves the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity and knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

18 U.S.C. § 1956(h)

## COUNT EIGHTEEN

The Grand Jury for the District of Maryland further charges that:

1.        Paragraphs 1 through 11 and 13 through 22 of Count One are incorporated here .

2.        On or about September 12, 2007, in the District of Maryland,

the defendant,

### MICHAEL HICKSON,

while under oath and testifying in a proceeding before the United States District Court for the

District of Maryland, knowingly did make a false material declaration, that is to say, did

misrepresent the financial condition of MDH in testifying that the Dream Homes Program was

not a Ponzi scheme and that the Dream Homes Program did not require new investor funds to

sustain itself.

3.        On September 12, 2007, **HICKSON** was called to testify before Judge Roger W.

Titus of the United States District Court for the District of Maryland, in the matter of <u>Williams,</u>

<u>et al. v. Lubin</u>, Civil No. RWT-07-2341.  The Court was considering a federal constitutional

challenge filed by **WILLIAMS** and MDH, among others, to the cease and desist order against

**WILLIAMS**, MDH and others concerning their activities regarding the Dream Homes Program.

The purpose of the September 12, 2007 hearing was for the Court to hear testimony and

argument regarding the merits of the federal constitutional challenge.  It was material to this

litigation for the Court to determine the financial condition of MDH and, specifically, whether

the Dream Homes Program was a Ponzi scheme, relying upon new investor funds to sustain

itself.

4.      At the time and place alleged, **HICKSON** appeared as a witness under oath at a proceeding before the Court and knowingly made the following false material declaration indicated in bold-faced type below in response to a question with regard to the material matters identified in the preceding paragraph:

**Specification One**
(Page 23, lines 13-17)

Q       The judge inquired or speculated that this might be a Ponzi scheme. I want to ask, is this program one that depends upon new money to pay off the old money?

A       **Quite frankly, no.**

4.      The testimony of **HICKSON** set forth in bold-faced type above, as he then and there well knew and believed, was false in that **HICKSON** knew that MDH required new investor funds at all times to sustain the Dream Homes Program because MDH had not generated any material revenue throughout its existence.

18 U.S.C. § 1623

## COUNT NINETEEN

The Grand Jury for the District of Maryland further charges:

1.      Paragraph 8 of Count One is incorporated here .

### The Scheme to Defraud

2.      On or about May 15, 2007, defendant **SMITH** knowingly and willfully devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud Chevy Chase Bank, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, and to obtain monies, funds and credits from Chevy Chase Bank by means of false and fraudulent pretenses, representations and promises ("the scheme to defraud").

3.      It was a part of the scheme to defraud that defendant **SMITH** traveled to a Bentley automobile dealership in the District of Maryland for the purpose of purchasing a 2007 Bentley Continental convertible automobile (the "Bentley automobile") with a total pre-tax selling price of $210,164.

4.      It was a further part of the scheme to defraud that defendant **SMITH** completed an "Applicant's Credit Statement" for the purpose of obtaining a loan for substantially the entire purchase price for the Bentley automobile.

5.      It was a further part of the scheme to defraud that **SMITH** stated on the "Applicant's Credit Statement" that he was employed by "Metropolitan Grapevine" as "president."

6.      It was a further part of the scheme to defraud that **SMITH** stated on the "Applicant's Credit Statement" as his annual income the artificially inflated amount of $550,000, when in fact he knew that this amount was substantially greater than his actual salary at MDH.

16

7.     The stated income for the credit application was material to Chevy Chase Bank's decision to approve the loan.

8.     Based on the materially false income information provided by **SMITH**, Chevy Chase Bank approved an automobile loan for **SMITH**'s purchase of the Bentley automobile and provided financing in the amount of $211,233,77.

### Executing the Scheme to Defraud

9.     On or about May 15, 2007, in the District of Maryland and elsewhere, the defendant,

**ISAAC JEROME SMITH,**

knowingly executed and attempted to execute the scheme to defraud by causing to be submitted a materially false credit application requesting loan financing for a 2007 Bentley automobile, VIN SCBDR33W47C046791, to Chevy Chase Bank stating that his annual income from MDH was $550,000, when in fact his annual income was materially less than $550,000.

18 U.S.C. § 1344
18 U.S.C. § 2

**FORFEITURE ALLEGATION (COUNTS ONE THROUGH SIXTEEN)**
(Forfeiture of Wire Fraud Proceeds)

1.      Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants

that the United States will seek forfeiture as part of any sentence in accordance with Title 28,

United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), in

the event of the defendants' convictions under Counts One through Sixteen of this Indictment.

2.      As a result of the offenses charged in Counts One through Sixteen, the defendants,

**ANDREW HAMILTON WILLIAMS, JR.,
MICHAEL ANTHONY HICKSON,
ISAAC JEROME SMITH, and
ALVITA KAREN GUNN,**

shall forfeit to the United States any and all property, real or personal, which constitutes or is

derived from proceeds traceable to such violations, including $70,000,000 and all interest and

proceeds traceable thereto, which forfeiture amount is based on at least $70,000,000 being the

amount of investor funds that **ANDREW HAMILTON WILLIAMS, JR., MICHAEL**

**ANTHONY HICKSON, ISAAC JEROME SMITH** and **ALVITA KAREN GUNN,**

fraudulently secured or caused to be secured for investment in the Dream Homes Program as

described in Counts One through Sixteen of the Indictment.

**Substitute Assets**

4.      If, as a result of any act or omission of the defendants, any proceeds subject to

forfeiture:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

18

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property that cannot be subdivided

without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p) to seek forfeiture of any other property of said defendants up to but not exceeding

$70,000,000.

28 U.S.C. § 2461(c)
18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)

*Rod J. Rosens* / JS
_____
Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date:   April 22, 2009